UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO.  8:12-cr-29-T-23EAJ

STEVEN FALSEY
_____/

## ORDER

A citizen's early morning complaint to "9-1-1" resulted in the discovery by police of a vehicle driven recklessly and left by the driver in a commercial parking lot and with the keys on the floor.  After police declared the vehicle abandoned, a search of the vehicle revealed a locked safe in the trunk, and a later search of the safe revealed two bags of narcotics.  Steven Falsey moves (Doc. 70) to suppress evidence of the contents of the safe.  The United States opposes (Doc. 72) Falsey's motion.

*******

An evidentiary hearing occurred on September 19, 2012.  AUSA James C. Preston, Jr., represented the United States, and John T. Kingston represented Steven Falsey, who was present.  The record establishes the following pertinent facts:

A supplier of cable and conduit, Kaf-Tech maintains an office and manufacturing facility at 2000 Tall Pines Drive in Largo, Florida.  According to James Brewer, the late-night shift supervisor at Kaf-Tech, Brewer stood outside the Kaf-Tech building about 2:30 a.m. on October 5, 2011, and smoked a cigarette.

Brewer saw a vehicle enter Kaf-Tech's parking lot at high speed.  (At the hearing Brewer estimated the speed at fifty to sixty miles per hour, but the police and the police report attribute to Brewer an estimate of seventy to eighty miles per hour [Def. Ex. 4 at page 6])  The vehicle traveled (with squealing tires, says Brewer) through the parking lot in front of the building (that is, to the immediate east of the building) and parked in a space marked by painted lines (the "last" space, says Brewer) and located in an unlighted part of the parking lot to the north of the building (the Kaf-Tech building features exterior lights but the parking lot is not otherwise lighted).

Moments later, although not seen by the driver, Brewer observed the driver open the driver's door, exit the vehicle, bend as if to retrieve something on the ground, run ("he took off running," says Brewer) westward at full speed (a sprint, says Brewer) across the parking lot, and disappear into the woods.  Brewer later reported that the driver was a bald "white male" wearing a white shirt and dark shorts.  Brewer promptly contacted the Largo police through "9-1-1" and reported the events.

During the hearing on September 19, Brewer testified that he saw only one person flee the vehicle and the parking lot; the officers who arrived at the scene reported initially, included in a written report, and testified at the hearing that Brewer said at the scene that two people exited the vehicle and fled.  The difference is both unresolved and intriguing and perhaps probative on another issue, but the difference

is inconsequential to the motion to suppress.  The Largo police within minutes

broadcast a dispatch to the scene.

Patrolling nearby with a dog in the patrol vehicle, "K-9" Officer Rogers heard

the dispatch (intended for Officer Compton in another patrol vehicle) and,

concluding that the dog might assist the search for a fleeing person, immediately

responded to the scene.  Ofc. Rogers arrived first, followed soon by Ofc. Compton

(and others).  Ofc. Rogers formally logged that he entered the Kaf-Tech parking lot at

4:11 a.m., which means that, if Brewer's estimate is correct, two hours elapsed

between Brewer's call to "9-1-1" at 2:30 a.m. and Ofc. Rogers' arrival, which is

mightily implausible and which places great doubt on Brewer's estimate of the time.

The dispatcher's log, which was unavailable at the hearing, was submitted (Doc. 84)

by the United States after the hearing and reports both an incoming call to the Largo

Police Department from "9-1-1" at 4:03:18 on October 5 and a dispatch at 4:05:13,

which is the most reliable and credible account of the time.  Ofc. Compton testified

that he received the dispatch at 4:05 and arrived at the scene in about five minutes.

Although he testified that he called "9-1-1" at 2:30 a.m., Brewer also testified that the

police arrived "roughly ten or fifteen minutes" after his call, which is a much more

reliable estimate and which I accept.  Therefore, the explanation supported by the

evidence in the present record is that Brewer mistook the time and that he saw the

vehicle and first called "9-1-1" closer to, and probably some minutes after, 3:45 and

not about 2:30.  In sum, the preponderant evidence shows a call from Brewer to

"9-1-1" about 3:45, a police dispatch about 4:05, an arrival moments later at Kaf-Tech by Ofc. Rogers, and in another moment or so an arrival by Ofc. Compton and others.

On arrival, Ofc. Rogers interviewed Brewer, checked the condition of the vehicle, and deployed the dog.  The vehicle was a "well maintained" 2005 BMW 745i with the doors closed but unlocked and with the keys plainly visible on the floor on the passenger's side.  Ofc. Compton arrived, spoke to Ofc. Rogers, looked in the vehicle, and noticed on the dashboard of the vehicle an electronic alarm display – still active – that reported the vehicle had been driven carelessly (probably with the door open while the vehicle remained in motion).  Ofc. Compton first joined Ofc. Rogers in an attempt to track the driver (and a second person, depending on who remembers correctly) through the woods, but the dog soon lost the trail ("the track seemed to fade," reports Ofc. Rogers).  Ofc. Rogers, Ofc. Compton, and the dog promptly returned to the parking lot.

Ofc. Compton began to trace the ownership of the vehicle and learned from the dispatcher that the vehicle's owner of record was Ronald Donaldson.  Ofc. Compton requested that St. Petersburg officers visit Donaldson.  Those officers discovered from Donaldson's grandmother that Donaldson, who was not at home, had sold the vehicle about two days earlier.  Donaldson's grandmother provided a telephone number, which the officer relayed to Ofc. Compton, who called Donaldson.  Donaldson confirmed that he sold the vehicle two days earlier for

$16,000 "in cash" to a party whom Donaldson called "Joe Fat."  Further inquiry revealed that about two days earlier Michael Falsey had applied for registration and a temporary tag for the vehicle.  St. Petersburg police visited Michael Falsey's listed address but no one responded to knocks on the door or to a telephone call to his home number.  Unable to contact the owner, police entered the vehicle to look for further evidence of the owner's location.  A binder of papers lay conspicuously on the back seat of the vehicle.  Police examined the papers and found several names, including the name and address of Heather Rehka.  Ofc. Rogers and Ofc. Compton visited Rehka's nearby home (less than a quarter of a mile), but no one responded to the officers' knocks on the door.

At that moment, the vehicle was undamaged, unconnected with any known crime, and unconfirmed as stolen ("ruled out as stolen," as Ofc. Compton aptly said). Although the exact sequence is challenging to re-construct, the police's inquiry and the compilation of resulting information was complete before Ofc. Compton called Sergeant Bradshaw not later than about 6:30 a.m.  Ofc. Compton described the circumstances to Sgt. Bradshaw and asked for instruction.  Ofc. Compton testified that Sgt. Bradshaw authorized Ofc. Compton to impound the vehicle, to conduct an inventory search at the scene, to use a towing service to remove the vehicle from the Kaf-Tech parking lot, and to impound the vehicle at the premises of the towing service. Ofc. Compton reported these events as follows:

> At this point, I did not have any information to follow up on to get in contact with Falsey. Given the time of night the call came out, the fact that the vehicle was reported as being driven at a high rate of speed, the suspect[']s actions of running out of the vehicle into the woods behind a business, and the vehicle being left unlocked with the key inside, I suspected that a crime had occurred or was occurring during the time of the incident. I contacted Sgt. Bradshaw on the telephone to get her input on how I should handle the vehicle and she said the vehicle should be impounded given the circumstances.

(Def. Ex. 4 at page 6)

The inventory search yielded a locked safe in the trunk of the impounded vehicle. In response to further inquiry from Ofc. Compton, Sgt. Bradshaw decided not to authorize entry into the locked safe, instructed Ofc. Compton to leave the safe in the trunk, and deferred the impound to Sergeant Marx of the Investigative Services Division. Officer Moore arrived at the Kaf-Tech parking lot and remained with the vehicle at Kaf-Tech until Joe's Towing arrived and removed the vehicle to impoundment. Ofc. Compton reported these events as follows:

> I went back to the vehicle to begin the impound. During the inventory of the vehicle, I found a First Alert safe in the trunk of the vehicle. The safe was locked. I contacted Sgt. Bradshaw again to give her an update on the impound and the fact that a safe was located. Sgt. Bradshaw said not to enter the safe at the time to allow more time for contact to be made with the owner. Sgt. Bradshaw said to continue[] the impound but to put a hold on the vehicle and refer the impound to Sgt. Marx. Sgt. Bradshaw advised that Sgt. Marx with the Investigations Services Division would continue with this on-going investigation and attempt to locate the owner. I completed the impound form and requested Joe's Towing to take the vehicle. Ofc. Moore arrived on scene and stayed with the vehicle until Joe's Towing arrived. I then cleared the call.

(Def. Ex. 4 at page 6)  In sum, Ofc. Compton called Sgt. Bradshaw before 6:30 a.m.,

received Sgt. Bradshaw's instruction to impound the vehicle, impounded and

searched the vehicle, discovered the locked safe, called Sgt. Bradshaw again, and

received Sgt. Bradshaw's instructions not to search the locked safe but to tow the

vehicle and await instructions from Sgt. Marx, all of which was accomplished (except

the actual towing, which appears to occur about 7:38 a.m.) before Ofc. Compton

"cleared the scene" about 7:00 a.m.  Ofc. Compton testified that, although the

vehicle was undamaged and although he did not know of any crime associated with

the vehicle or the driver, he thought the vehicle was properly impounded because he

was "suspicious" that the driver "was up to no good."

        Michael Falsey, the defendant's father, testified that he called the police about

2:00 p.m. on October 6 to inquire about the vehicle and was told that the vehicle was

impounded by the police and that the responsible officer was on vacation.  Falsey's

telephone record (actually, a record of someone else's telephone putatively used by

Falsey) appears to confirm a call to the Largo police at 2:04, the time claimed by

Falsey.  But much about the content and circumstances of this call is foggy, and

Falsey is much less than a disinterested or reliable witness.  Confirming Falsey in

part, Sergeant Trebino reported a call from Falsey on October 6 and a conversation

on October 7:

>           However, in speaking with Joe's Towing, it was learned that, someone
>       who claimed to be, Michael Falsey, had called inquiring on how to
>       "buy" his car back.  He was advised by Joe's Towing that he needed to

contact Sgt. Trebino.  He did that, however, not until late on the 6th of
October.  I made contact with Michael Falsey on 10/07/11 at phone
number 727-643-7190 and spoke with him in regard to the release of
the vehicle.  Not once, did he ever ask how the vehicle got there or
why it had been towed.  His only concern was to "buy" it back from us
and get it to the mechanic that he had an appointment with.  I advised
him that the vehicle would be release[d] to him on 10/11/11.

For the purpose of this order, I accept that someone telephoned the Largo

police (the content of the conversation is not reliably evidenced) at about 2:00 p.m.

on October 6, as shown in the telephone record.  I reject the testimony that the

operator or anyone else answering at the Largo police department told Falsey that

he could not recover his vehicle until an officer returned from vacation (perhaps

that was said, but better evidence than Falsey's testimony is necessary as proof).

Additionally, the evidence establishes that about 4:30 p.m. on October 6 Sgt. Trebino

and Detectives Wilcox, Kraft, and Hernandez, in the company of Joe, who is the

proprietor of Joe's Towing and who was the custodian of the impounded vehicle,

entered the vehicle, forced open the safe, and discovered the contested evidence.

*******

Since no later than *South Dakota v. Opperman*, 428 U.S. 364 (1976),

impoundment and inventory search of a vehicle is unquestionably available to law

enforcement in a "routine administrative care-taking function" so long as the

"protective search is carried out in accordance with standard procedures in the local

police department" and unless the search is a "subterfuge for [a] criminal

- 8 -

investigation[]." 428 U.S. at 374.  *Colorado v. Bertine*, 479 U.S. 376 (1987); *Florida v. Wells*, 495 U.S. 1 (1990).

The Largo police department maintains a set of "directives" (Def. Ex. 1) that "establish[] procedures for impounding and releasing vehicles."  Section II of the directives requires that the Largo police department "properly inventory and secure any vehicle impounded at the direction of agency personnel."  Section III governs "vehicle removal," expressly including removal of a vehicle from "public property" and from "private property," although each is regulated by a different provision in the directives.  Paragraphs III(A)(1) – (A)(9) of the directives permit the police to remove only these vehicles from public property:

1   Vehicles held as evidence in a pending criminal case.

2   Unattended vehicles that constitute traffic obstructions.

3   Vehicles operated on public roads in such a condition as to create an immediate threat to the safety of other motorists.

4   Recovered stolen vehicles and vehicles used in the commission of a crime.

5   Removal is necessary for public safety.

6   Vehicles used in the commission of felonies, and held for forfeiture.

7   Vehicles whose drivers have been taken into custody and there is no owner/registrant, co-owner/co-registrant, or with the permission of the owner/registrant any other passenger or other licensed person on scene at the time of arrest that is able to take custody of the vehicle.

> 8    Attended disabled vehicles constituting traffic obstructions
>      where the person in charge cannot provide for the vehicles'
>      removal.
>
> 9    Vehicles meeting the statutory requirements for abandoned
>      property.

Each of these nine subsections governs a different category of vehicle encountered on

public property.

Finally and critically, only a single subsection in the directives,

Paragraph III(F)(1), governs removal of a vehicle located on "private property":

> Officers do not have the authority to remove vehicles from private
> property unless they have been reported stolen, used in the
> commission of a crime, or seized for forfeiture.

The directives also explicitly require that during the inventory of an impounded

vehicle "the contents of all packages or containers will be examined, accounted for,

and inventoried."

*******

Falsey's motion to suppress asserts several objections to the Largo police's

discovery of narcotics in the trunk of the BMW.  First, Falsey asserts that the police

in defending the search and seizure rely upon "consent" received from Ronald

Donaldson, who had sold the vehicle two days before the events at issue.  However,

no part of the response by the United States assumes the efficacy of Donaldson's

consent, and nothing in the record suggests that Donaldson retained any power to

consent at the time of the search.  The United States attempts no reliance on

Donaldson's consent, and the attempt, if undertaken, would fail.

Second, Falsey's motion to suppress asserts that the Largo police searched the

vehicle because the officers suspected that a crime in which the vehicle was employed

either had occurred or was occurring or would occur soon and that, therefore, the

officers believed the vehicle was subject to impoundment and inventory because of

paragraph III(F)(1) of the Largo police department directives, which states, "Officers

do not have the authority to remove vehicles from private property unless they have

been reported stolen, used in the commission of a crime, or seized for forfeiture."

The record establishes that at the time the vehicle was impounded the Largo police

lacked evidence that the vehicle had been "used in the commission of a crime."  The

presence of the vehicle at Kaf-Tech and the attendant circumstances raise a measure

of suspicion and warrant cautious inquiry by law enforcement but fail even arguably

to present evidence that the vehicle was "used in the commission of a crime."  If the

vehicle was used in a crime, how was it used?  Used when?  Used in what crime?

Used in a crime committed by whom and against whom and where?  At the moment

of impoundment and at each stage of the inventory search, a reasonable officer could

do no more than wildly guess at the answers, and wild guessing is no basis for

concluding that a vehicle was employed in the commission of a crime.  The

impoundment and inventory search by the Largo police in this instance were plainly

unwarranted under authority granted in the Largo police department's directives if a

vehicle is "used in the commission of a crime."  An attempt to justify the search of

Falsey's vehicle promptly fails if the attempted justification depends upon the use of

the vehicle in the "commission of a crime."

Third, the motion to suppress objects that, because the vehicle was towed to

the impoundment facility at Joe's Towing and because the vehicle resided – safe and

sound – at Joe's Towing before the visit by Sgt. Trebino and the three detectives to

complete the inventory search (by forcing open the safe in the trunk of the vehicle),

the inventory search that revealed the narcotics was entirely unnecessary and outside

the permitted purposes of an inventory.  However, the applicable law permits the

search of a container, package, or compartment within an impounded vehicle if the

police department's regulations require the search, and the Largo police department's

regulations require the search of a container, package, or compartment in an

impounded vehicle.  Falsey's argument – that the vehicle was safely situated at Joe's

Towing and that a search of the safe in the trunk was unnecessary – is absolutely

wrong.  The Largo police department's regulations govern the inventory search and

(wisely) require the inspection of a container, package, or compartment.  Whether

during the second inventory the police's failing to search the safe in the trunk of the

vehicle would have been an acceptable risk to the police is a superfluous question; if

the impoundment was proper, the inventory was proper.  3 Wayne R. LaFave, *Search

and Seizure: A Treatise on the Fourth Amendment*, § 7.4(a).

The United States opposes Falsey's motion to suppress and defends the two-phase inventory by the assertion that, because Falsey "abandoned" the vehicle, Falsey "forfeited" his reasonable expectation of privacy in the contents of the vehicle and, perforce this forfeiture, a search of the vehicle was not "unreasonable" under the Fourth Amendment.   The United States asserts boldly in the written response that "there is no question the vehicle was voluntarily discarded, and, therefore, Falsey forfeited his Fourth Amendment rights in regards to the vehicle." (Doc. 72 at 3)  The United States squarely rests opposition to the motion to suppress on the notion that the vehicle was "abandoned," properly impounded, and properly inventoried.

The Largo police department's directives authorize removal of an abandoned vehicle from public property under prescribed circumstances, but the parking lot at Kaf-Tech is not public property; the parking lot is private property.  Therefore, no part of the Largo police department's directives that govern events on public property applies to the impoundment and search of Falsey's vehicle.

Although acknowledging that under Section 715.07, Florida Statutes, a property owner may cause a licensed towing service to remove a vehicle parked without permission on private property, the Largo police department's directives explicitly limit to only three circumstances the right of the Largo police to impound a vehicle found on private property.  None of the three applies in this instance.

Even if this parking lot at Kaf-Tech were public property, the part of the Largo police's directives that governs removal of a vehicle from public property includes

authorization for removal from public property of an "abandoned vehicle" only if the

vehicle meets the "statutory requirements for abandoned property."  But because

Falsey was an "identifiable owner" and because the vehicle was "well maintained"

and valuable to the "rightful owner" – and perhaps for other reasons, as well,

Falsey's vehicle was not "abandoned property" under Section 705.101(3), Florida

Statutes.

Even if Largo's directives authorized removal of a vehicle abandoned on

private property and even if Largo's directives did not incorporate Florida's

"statutory requirements for abandoned property," Falsey's vehicle would not qualify

for removal, impoundment, and inventory for the invincible reason that the vehicle

was not demonstrably "abandoned."  As stated in *United States v. Jefferson*, 451 Fed.

Appx. 833, 834 (11th Cir. 2011):

> The critical inquiry in determining whether property has been
> abandoned is "whether the person prejudiced by the search . . .
> voluntarily discarded, left behind, or otherwise *relinquished his*
> *interest in the property* in question so that he could no longer retain
> a reasonable expectation of privacy with regard to it at the time of
> the search." *Ramos*, 12 F.3d at 1022 (quotations and citations
> omitted) (emphasis in original).

At the time of the putative impoundment around 6:30 a.m., the Largo police

had no knowledge that Falsey's vehicle was involved in the commission of a crime or

that the vehicle itself was a crime scene or part of an accident scene.  Also, the police

knew that the vehicle was in good condition and well-maintained, the police knew

that the owner had purchased this luxury vehicle for cash only two days earlier, the

police knew that the vehicle was parked in an orderly manner in a striped parking space in a private parking lot accessible to the public (immediately next to Ulmerton Road, a four-lane, east-west, arterial street in a densely populated county), the police knew that the driver had departed the vehicle immediately adjacent to a neighborhood in which a female friend of the driver's lived, the police knew that the driver had departed but not under pursuit by police or with any other known reason not to return to the scene to re-claim the recently acquired vehicle, the police knew that the vehicle appeared to pose no hazard to the public, the police knew that the vehicle neither constituted nor caused an obstruction to traffic, and – perhaps most tellingly – the police knew that the driver had left the vehicle only a few minutes earlier (only two hours or so at the moment the tow truck departed).  Neither party has found and I have not found any case, state or federal, that permits under these circumstances impoundment and inventory search of a vehicle because the vehicle is "abandoned," especially when the owner is known and his reasonable availability and his explanation are not yet determined.  The Largo police had ground for suspicion and further inquiry, if they chose, but the driver of Falsey's vehicle had not discernibly departed from the vehicle without the intention to return.  The vehicle was not abandoned.

Paragraph III(F)(2) of the Largo police directives states:

> Property owners or their authorized representatives may have vehicles removed from their private property by a wrecker company of their choosing in accordance with F.S.S. 715.07.

Section 715.07(2), Florida Statutes, states in pertinent part:

> The owner or lessee of real property, or any person authorized by
> the owner or lessee, which person may be the designated
> representative of the condominium association if the real property
> is a condominium, may cause any vehicle or vessel parked on
> such property without her or his permission to be removed by a
> person regularly engaged in the business of towing vehicles or
> vessels, without liability for the costs of removal, transportation,
> or storage or damages caused by such removal, transportation, or
> storage . . . .

The proper course for Largo police in the facts of this case was to notify the owner of

the parking lot that a licensed towing service will withdraw the vehicle from the

parking lot at no cost to the owner.

## CONCLUSION

As stated in *United States v. Kimhong Thi Le*, 474 F.3d 511, 514 (8th Cir. 2007):

> The impounding of a vehicle passes constitutional muster so long
> as the decision to impound is guided by a standard policy–even a
> policy that provides officers with discretion as to the proper course
> of action to take–and the decision is made "on the basis of
> something other than suspicion of evidence of criminal activity."
> *Colorado v. Bertine*, 479 U.S. 367, 375, 107 S. Ct. 738, 93 L.Ed.2d
> 739 (1987).  These parameters are designed "to ensure that
> impoundments and inventory searches are not merely a ruse for
> general rummaging in order to discover incriminating evidence."
> *Petty*, 367 F.3d at 1012 (internal quotation omitted).

*See also United States v. Foots*, 340 Fed. Appx. 969 (5th Cir. 2009).  The impoundment

and inventory search of Falsey's vehicle was wholly unauthorized by the Largo

police department's directives and occurred contrary to the governing directives of

*South Dakota v. Opperman* and subsequent authority.  Because this unauthorized

impoundment and inventory search contravenes the Fourth Amendment, the motion

to suppress is **GRANTED** and both the evidence discovered in the locked safe in the

trunk and any evidence discovered as a consequence of the initial discovery is

**SUPPRESSED**.

ORDERED in Tampa, Florida, on October 9, 2012.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE